Defendants' primary legal argument in support of the appeal is that the plaintiff is not a "subcontractor" within the meaning of N.C.G.S. § 97-19. The argument is offered despite defendants' admissions that the defendant Downey entered into a contract with the Navy; that a portion of this work required that metal clips be installed by welding; that Downey entered into a contract with the plaintiff to perform this work; and, that plaintiff was injured in the course and scope of carrying out the latter contract. Defendants' brief makes extensive references to the relative informality of this contract. In sharp contrast to other subcontracts, it was oral, it was not formally reported to the government, the work was of a relatively minor scope and of brief duration, etc. Defendants admit that a subcontract may be oral, etc. But they argue that there is a sub-species of subcontract outside the scope of N.C.G.S. § 97-19 to which plaintiff's belongs because
 . . . Defendant Downey did not surrender all of its contractual obligations on the Cherry Point project to subcontractors. It retained certain portions of the work to be performed by its own employees, including masonry services. Ancillary to the contractual obligations retained by Defendant Downey was installation of the metal clips, which required a certified welder. Welding the metal clips did not constitute a separate part of the work retained by Downey, but instead was performed only as necessary to permit Downey to continue the work it had retained. Defendant Downey needed plaintiff's expertise as a welder to complete one portion of the obligations it retained under its contract with the Navy, but plaintiff never became responsible for performance of that contract. Defendant Downey remained obligated to perform the work, which included welding on metal clips. The parties stipulated that plaintiff's work was not a separate contractual obligation, but was incidental to work being performed by Downey under its contract . . . The same logic would apply to someone who delivered nails to a job site where framing was to be performed. If plaintiff's theory is accepted in the present case, all state and federal building inspectors would have been subcontractors, since no work could have been performed on the project at all without their approval.
The statute applies whenever (in construction terms) an owner enters into a contract with a principal contractor, who in turn lets a subcontract to a third entity for the performance of all or a part of the work required by its contract with the owner.Mayhew v. Howell, 102 N.C. App. 269, 401 S.E.2d 831 (1991). The principal contractor remains ultimately responsible to the owner for performance of their contract in all instances. The principal contractor could "surrender all of its contractual obligations" to the third entity only by novation — that is, the mutual agreement of all three parties to a new contract, extinguishing the old one to substitute the third entity for the original principal contractor. The plaintiff here was not a party to such an agreement. The relative size and significance of the work, whether the principal contractor's employees work at the same site, how the principal contractor and owner have agreed to administer their contract, or other agreements between third parties are utterly irrelevant to a subcontractor's status under the statute. The defendant principal contractor in this case, according to the stipulated facts, is one of those referred to in the statute "who has undertaken for another to do something, the performance of which he has in whole or in part sublet to another." Evans v. Tabor City Lumber Co., 232 N.C. 111, 117,59 S.E.2d 612 (1950). If Downey's control extended beyond the results for which it contracted to include the means and details of plaintiff's performance, then plaintiff is entitled to the same compensation as Downey's employee. Under any circumstances, the purpose of the statute — "to prevent principal contractors, intermediate contractors and sub-contractors from relieving themselves of liability under the Act by doing through sub-contractors what they would otherwise do through the agency of direct employees" — is achieved. Withers v. Black, 230 N.C. 428,434, 53 S.E.2d 668 (1949). There is no such thing as a job with three or more employees, which a single firm has contracted to perform for an owner, for which workers' compensation coverage is not required.
There is a recognized distinction between a subcontractor and a materialman, illustrated by the difference between vending nails and driving them in accordance with contract specifications.Forsyth Mem. Hosp., Inc. v. Armstrong World Indus., 336 N.C. 438,444 S.E.2d 423 (1994). The cases cited by the defendants also involve distinctively different fact situations. In Greene v.Spivey, the defendant "purchased and worked standing timber and sold the logs in the open market wherever he could at the prevailing price," and had no contract with anyone other than his employees. 236 N.C. 435, 73 S.E.2d 488 (1952). He arranged compensation for his employees with another business and their carrier. In Evans, supra, the lumber company purchased timber from the owners as they cut it and resold it, without a prior obligation to do either. In Cook v. Norvell-Mackorell Real EstateCo., a real estate firm that provided rental and maintenance management services to owners of rental property acted as an agent for its client in arranging a roofing contract between a construction firm and the owner of the property needing the roof.99 N.C. App. 307, 311-12, 392 S.E.2d 758 (1990). In each of these cases, the Commission and the Court found that no subcontract existed.
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner, with slight modifications, as follows:
The following were entered into by the parties at the hearing before the Deputy Commissioner as
STIPULATIONS
1. At the time of the alleged injury by accident, defendants were subject to and bound by the provisions of the Workers' Compensation Act.
2. Harleysville Insurance Company was the carrier on the risk.
3. The date of injury was April 13, 1992.
4. L.A. Downey and Son, Inc. (Downey) contracted with the U.S. Navy for the building of a jet simulator facility at the Cherry Point Marine Corps Air Station and Downey was the principal contractor.
5. The contract between Downey and the U.S. Navy included all work necessary to comply with its contract with the Navy.
6. Downey engaged Terry Young to attach special metal clips in connection with the work being performed by Downey pursuant to its contract.
7. Downey was an independent contractor.
8. Terry Young was an independent contractor.
9. Terry Young did not waive in writing his alleged right to coverage under N.C.G.S. § 97-19.
10. Terry Young was injured by accident on April 13, 1992 when he fell from a ladder where he had been welding.
11. Plaintiff's average weekly wage was $281.33 which yields a compensation rate of $187.56.
* * * * * * * * * * *
Based upon all the competent credible evidence of record, the Full Commission makes the following additional
FINDINGS OF FACT
1. Plaintiff has previously been determined to have sustained a compensable injury by accident when he fell from a ladder on April 13, 1992. He was immediately taken to the emergency room where he was examined by Dr. Bright, an orthopaedic surgeon. Dr. Bright found multiple injuries, the most serious of which were open, comminuted fractures of both femurs which had torn through the muscles of his thighs. However, plaintiff also had fractures of his right radius, a dislocated lunate bone in his right wrist, a nondisplaced fracture of the fibular head in his left knee and bloody fluid in his right knee which indicated ligamentous and articular damage.
2. Dr. Bright immediately operated on plaintiff's legs to reduce the femur fractures, debride the devitalized muscle and drain the fluid in the right knee. He placed both legs in traction. Plaintiff subsequently underwent additional surgery to the right wrist. His condition then became complicated by his development of fat embolism syndrome, a life threatening condition caused by fat from the fracture sites going to the lungs. He was rendered unconscious and he flailed around in his bed, making it more difficult for the leg fractures to heal. However, the embolism ultimately resolved and his femur fractures healed without his having to undergo further surgery.
3. Following his discharge from the hospital, plaintiff underwent physical therapy and follow-up care by Dr. Bright. For a period of time after his discharge, he required home nursing care which was provided by his live-in girlfriend, Sharon Robertson. His condition improved and by the end of the year he was able to walk on a limited basis. Dr. Bright subsequently diagnosed him with a partial separation of his left shoulder, but there was no evidence of a torn rotator cuff on the MRI. Although plaintiff indicated that he was also treated for internal injures, his medical reports were not placed into evidence so his statement could not be confirmed. Dr. Rice later treated him from January to August 1993 for gastrointestinal problems, high blood pressure, abnormal liver function and insomnia, but these conditions were not proven to have resulted from the fall. They were more likely related to or aggravated by his use of alcohol and his smoking.
4. As a result of his fall on April 13, 1992, plaintiff was unable to work until the date of hearing on July 16, 1993. Dr. Bright did not release him to return to work as of January 14, 1994 when he was last seen. Functional capacity testing was ordered at that time. The testing was subsequently performed and revealed significant impairment of his upper and lower extremities. The therapist apparently recommended additional therapy, but defendants refused to pay for it.
5. Plaintiff had not reached maximum medical improvement as of the time Dr. Bright testified, and the doctor recommended additional medical treatment. Consequently, no findings are made regarding the extent of permanent partial disability plaintiff may sustain as a result of the injury giving rise to this claim. However, he had impairment to his left arm from the partial separation of the shoulder, impairment to his right arm due to the fracture, the dislocated lunate bone and pressure on the medial nerve, impairment to both legs from the displaced fractures and muscle damage, and impairment to both knees. His activities were restricted as a result of these conditions, and Dr. Bright was of the opinion that he would never return to work in his former capacity as a welder. The Department of Vocational Rehabilitation sponsored him for schooling in electronic engineering technology, and he has done well in the classes he has taken at the local community college.
6. The record in this case before the Deputy Commissioner closed with the receipt of the deposition of Dr. Bright on June 17, 1994.
* * * * * * * * * * *
Based on the foregoing findings of fact, the Full Commission makes the following additional
CONCLUSIONS OF LAW
1. Plaintiff is entitled to compensation for temporary total disability at the rate of $187.56 per week for 65 and five-sevenths weeks for the period from April 13, 1992 through the date of hearing on July 16, 1993, and continuing thereafter for as long as he remains so disabled. N.C.G.S. § 97-29.
2. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident, including reasonable compensation for home nursing services rendered by Ms. Robertson, physical therapy and vocational rehabilitation. N.C.G.S. §§ 97-2 (19) and -25.
3. Plaintiff is entitled to interest on the award from the date the hearing before the Deputy Commissioner concluded, being June 17, 1994. N.C.G.S. § 97-86.2.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Defendants shall pay compensation to plaintiff at the rate of $187.56 per week for 65 and 6/7ths weeks for the temporary total disability he sustained as a result of this injury by accident through July 16, 1993, and shall continue to pay compensation thereafter for as long as he remains so disabled. That portion of this compensation which has accrued shall be paid in a lump sum, subject to the attorney's fees hereinafter approved.
2. Defendants shall pay all medical compensation expenses incurred by plaintiff as a result of this injury by accident when bills for the same have been submitted through the defendants to the Industrial Commission and approved by the Commission.
3. An attorney's fee in the amount of 25% of the compensation awarded is approved for plaintiff's counsel, including a lump sum from the accrued compensation and every fourth check thereafter, but excluding the interest hereinafter awarded.
4. Defendants shall pay interest on the award at the judgment rate from June 17, 1994 or subsequent date it accrued.
5. Defendants shall pay the costs.
 S/ _________________________ J. RANDOLPH WARD COMMISSIONER
CONCURRING:
S/ _________________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ _________________________ D. BERNARD ALSTON DEPUTY COMMISSIONER
JRW/tmd 5/17/95